UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 6:07-CV-444-KKC

TECO COAL CORPORATION and
PREMIER ELKHORN COAL COMPANY,                                    PLAINTIFFS,

v.                                    **OPINION & ORDER**

ORLANDO UTILITIES COMMISSION,                                    DEFENDANT.

**** **** **** ****

This matter is before the Court on the Motion to Dismiss (Rec. No. 13) filed by the Defendant, the Orlando Utilities Commission.

The primary issues raised by the motion are 1) whether the Court can reform the coal supply contract between the parties to substitute a new contract price for coal and to replace the designated price indexes which periodically adjust the contract price; and 2) whether evidence is required on the issue of whether the sellers' performance under the contract is commercially impracticable. For the following reasons, the Court answers the first question in the negative and the second in the affirmative. Accordingly, the Court will grant the Motion to Dismiss in part and deny it in part.

I.    **FACTS.**

The Plaintiffs TECO Coal Corporation and Premier Elkhorn Coal Company filed this action requesting that the Court establish a new contract price and substitute new government indexes that adjust the contract price in a coal supply contract (the "Contract") which the parties entered into in 1995. They also ask the Court to declare their performance under the contract for the years 2008 to 2011 commercially impracticable. TECO and Premier assert that they stand to lose as much as $49

million under the current contract price and indexes.

TECO is the parent company of Premier. (Rec. No. 1, Complaint, ¶ 13).  Premier mines and sells the coal sold to the Orlando Utilities Commission (the "Buyer") under the Contract (Rec. No. 1, Complaint, ¶ 23). Together TECO and Premier will be referred to as the "Sellers" in this Opinion.

Under the Contract, the Buyer agreed to purchase 480,000 tons of coal each year from the Sellers, plus or minus twenty percent (20%).  (Rec. No. 1, Complaint, Ex. A, Contract, Art. 2.1). The Contract contained an expiration date of December 31, 2006 but granted the Buyer the option to extend the Contract for five years, through December 31, 2011. (Rec. No. 1, Complaint, Ex. A, Contract, App. A).  The Buyer has exercised the option to extend the Contract through 2011.  (Rec. No. 1, Complaint ¶ 6).

### A.      Adjustments in the Coal Price based on Indexes.

In their Complaint, the Sellers state that the Contract contains a mechanism designed to adjust the contract price to account for certain kinds of changes in the Sellers' cost of production. (Rec. No. 1, Complaint ¶ 2).

Specifically, the Contract establishes a base price for the coal sold under the Contract of $24.49 per ton. (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.1, App. D). This was the contract price for the coal for the first six months of the Contract.  (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.2, App. D). The base price is made up of six components: labor, supplies, power, equipment, the fixed price component, and government impositions. (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.3, App. D).  The Contract mandates that the "Labor, Supplies, Power, and Equipment components of the Base Price shall be subject to individual adjustment every 6 Months to reflect changes" in certain government indexes specified in the Contract.  (Rec. No. 1, Complaint, Ex. A,

2

Contract, Art. 6.4, App. D).  The government indexes specified for each of these components in the contract are:

| | | |
|---|---|---|
| Labor | – | Average Hourly Earnings – Bituminous Coal & Lignite Mining Standard Industrial Classification ("SIC") 122 |
| Supplies | – | Producer Price Index ("PPI") – Industrial Commodities Less Fuel and Related Products and Power |
| Power | – | Industrial Power – PPI 0543 |
| Equipment | – | Mining Machinery – PPI 1192 |

 (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.3, App. D).

The Contract specifies what must occur should any of the indexes specified in the Contract be "discontinued." In such an event, the "indexes specified by the appropriate government agency as the replacement indexes, if any, shall be used."  (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.3).  If, however, no replacement indexes are specified by the appropriate government agency, then "new indexes which most accurately reflect changes in the applicable cost component or subcomponent shall be substituted by mutual agreement of the parties." (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.3).

The Contract also specifies what shall occur if "the basis of the calculation of the indexes specified herein is substantially modified."  In such an event, "the indexes as modified may continue to be used or proper indexes may be substituted by mutual agreement of the parties."  (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.3).

## B.     The Sellers' Cost Increases.

The Sellers assert that, for the first five years of the Contract, the indexes functioned as intended because they captured 92 percent of the unit cost of the goods and services used to mine

coal. (Rec. No. 17, Response at 11; Rec. No. 1, Complaint ¶ 35).

The Sellers allege, however, that, beginning in 2002, the designated price indexes failed to capture the bulk of the cost increases incurred by them. The Sellers allege that, as a result, they will lose tens of millions of dollars. (Rec. No. 1, Complaint ¶ 2). The Sellers assert that from 2002-2007, Premier incurred substantial cost increases because of increases in the cost of goods and services it uses in mining the coal. They assert that, from either 2002-2006 or 2003 to 2007, the price indexes failed to capture approximately 75 percent of the cost increases incurred by Premier. As a result, the amount that the Buyer pays for coal under the Contract is far below the Sellers' mining costs. (Rec. No. 1, Complaint ¶ 4; Rec. No. 17, Response at 12).

The Sellers assert that from 2002-2006, they experienced cost increases of $16.84 per ton but that the price indexes increased the contract price for coal by only $4.27 per ton. (Rec. No. 1, Complaint, ¶ 35). The Sellers assert that, as a result, the contract price for coal is s $12.57 per ton below what it would have been had the price indexes functioned as the parties intended for them to function. (Rec. No. 1, Complaint, ¶ 36). The Sellers assert that the $12.57-per-ton deficiency is now "embedded" in the contract price for the coal, meaning that it will not be reduced or eliminated even if the price indexes or new indexes function as intended for the remainder of the contract term. (Rec. No. 1, Complaint, ¶ 36).

The Sellers assert that, because of the $12.57-per-ton price deficiency, they will lose $7,240,00 per year from 2008-2011, or approximately $29,000,000 in total. (Rec. No. 1, Complaint, ¶ 37). They further assert that, if the price indexes fail for the remainder of the contract term at the same rates as they did from 2002-06, then the Sellers will suffer an additional loss of $20,000,000

for a total loss of $49 million. (Rec. No. 1, Complaint, ¶ 7, 46).[1]

The Sellers assert that the parties did not intend such a result and that, to the contrary, the price indexes were intended to eliminate the risk that such a result would occur. (Rec. No. 1, Complaint ¶ 8). The Sellers further assert that the parties failed to foresee the possibility that the price indexes would materially fail to achieve their intended purpose and, thus, they failed to provide explicitly in the Contract for such an event. (Rec. No. 1, Complaint ¶ 8).

### C.      The Remedies Sought by the Sellers.

The Sellers assert that, if the contract price for coal had been adjusted in 2002-06 to accurately reflect the changes in their costs, the price at which coal would be sold under the contract as of January 1, 2007 would have been about $42.68. (Rec. No. 1, Complaint, ¶ 47). They assert that that this should have been the contract price for coal for the year 2007. They further assert that this price should then be adjusted for January 1, 2008 from year-end results that are not yet available. (Rec. No. 1, Complaint, ¶ 47). They further assert that the Contract Price from January 1, 2008 to the date of judgment should be adjusted using new government indexes. (Rec. No. 1, Complaint, ¶ 48). The Sellers then identify eight cost categories – labor, medical, equipment, diesel fuel, trucking, contract mining, commodities, and contract services – that they assert should be included in the base price and a new government index for each category. (Rec. No. 1, Complaint, ¶ 48).

The Sellers assert that these new government indexes are "more specifically focused on costs incurred in coal mining" than the government indexes specified in the contract. (Rec. No. 1,

---

[1] In their Complaint, the Sellers also assert they will suffer additional losses of $11 million due to "cost categories that are not addressed by the price adjustment mechanism in the Contract." (Rec. No. 1, Complaint, ¶ 38). In their Response, they discuss only the $49 million resulting from the alleged failure of the price indexes to capture the Sellers' costs. (Rec. No. 17, Response at 12).

5

Complaint, ¶ 62).

The Sellers ask the Court to do one of three things.

The first option is for the Court to:

a)      declare that, from January 1, 2008 on, the Sellers are entitled to a "reasonable price at the time for delivery" of the coal pursuant to Fla. Stat. § 672.305(1)(a) and (c);[2]

b)      establish a "reasonable price" for the coal as of January 1, 2008 and adopt new price indexes which would adjust the contract price from January 1, 2008 until the remainder of the Contract; and

c)      declare that the Buyer has a right to terminate the Contract on sixty days' prior written notice to the Sellers if he does not wish to continue to purchase coal at the new contract price or under the new price indexes established by the Court.

(Rec. No. 1, Complaint ¶ 10(a) - (d); Count I, Prayer for Relief).

Alternatively, as a second option, the Sellers ask the Court to declare the contract terminated.

(Rec. No. 1, Complaint, ¶ 10(e), Count II, Prayer for Relief).

Finally, a third option presented by the Sellers is for the Court to find that the Sellers' performance under the Contract is commercially impracticable under Fla. Stat. § 672.615 and excuse them from further performance. (Rec. No. 1, Complaint, ¶ 10(f), Count III, Prayer for Relief).

## II.      STANDARD.

The Buyer has moved to dismiss the Sellers' Complaint. On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the "factual allegations in the complaint must be regarded as true." *Scheid v. Fanny Farms Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quoting *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983)). In order to survive a motion to dismiss, the factual

---

[2] The Contract provides that it is to be governed by Florida law and both parties agree that Florida law governs this action. (Rec. No. 1, Complaint, Ex. A, Contract, Art. 11.5).

allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" and to nudge his claim "across the line from conceivable to plausible." *Id*. at 1974. In practice, a complaint must contain "either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.1993)(quotations omitted).

### III.   ANALYSIS.

### A.   Whether the Court can Impose a New Contract Price and New Price Indexes under Fla. Stat. § 672.305.

The Sellers assert that § 672.305 of the Florida Statutes gives this Court the authority to establish a new base price for coal and new indexes by which the base price would be adjusted. That statute provides:

(1)   The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case, the price is a reasonable price at the time for delivery if:

(a)   Nothing is said as to price; or

(b)   The price is left to be agreed by the parties and they fail to agree; or

(c)   The price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and is not so set or recorded.

Fla. Stat. § 672.305(1).

But, by its own terms, the statute permits the imposition of a "reasonable price" only where the parties concluded a contract without settling the price. That is not the case with regard to the Contract at issue in this action. In fact, the parties' agreement as to the contract price for coal was set forth in great detail in Article 6 and Appendixes D and G of the Contract.

There is no allegation that the contract price can no longer be established by the price-setting mechanism detailed in the contract.  In their Response to the Motion to Dismiss, the Sellers briefly argue that subsection (b) of § 672. 305(1) applies because the Sellers have "attempted to negotiate an adjusted price. . .but [the Buyer] refused."  Accordingly, the Sellers argue, the Court should determine that "the price [was] left to be agreed by the parties and they fail[ed] to agree" as provided in subsection (b). However, for purposes of determining if Section 672.305 is applicable, the Court is only concerned with whether the Contract itself contains a price or a mechanism that establishes the price for coal.  There is no dispute that this Contract has such a mechanism.  For purposes of this determination, the Court is not concerned with the results of any failed efforts by the Sellers to persuade the Buyer to agree to a pricing mechanism different than that required by the Contract.

Because the Contract sets the price for coal, Fla. Stat. § 672. 305(1) does not apply to this matter and the Sellers' claim under that statute must be dismissed.

**B.      Whether the Court can Substitute a New Contract Price and New Indexes Because there is a Latent Ambiguity in the Contract.**

The Sellers' primary argument in support of its assertion that this Court should substitute a new price and new price indexes for those specified in the Contract is not that the parties did not agree on a price for coal but that they failed to address what to do if the indexes should fail to track the Sellers' actual unit costs, causing them to suffer tens of millions of dollars in losses.  The Sellers argue the parties' failure to provide for such a situation creates a "latent ambiguity" in the Contract.

"A latent ambiguity. . . exists where a contract fails to specify the rights and duties of the parties in certain situations and extrinsic evidence is necessary for the interpretation or a choice between two possible meanings." *Emergency Associates of Tampa, P.A. v. Sassano, D.O.*, 664 So.

8

2d. 1000, 1002 (Fla. Dist. Ct. App.1995)(quotations and citation omitted). It "arises when a contract on its face appears clear and unambiguous, but fails to specify the rights or duties of the parties in certain situations." *Wheeler v. Wheeler*, 964 So. 2d 745, 749-50 (Fla. Dist. Ct. App. 2007).

The significance of the Court finding a "latent ambiguity" in an otherwise unambiguous contract is that such a finding permits the parties to introduce evidence regarding their intent. Such evidence is otherwise impermissible in an unambiguous contract. "As a general rule, in the absence of some ambiguity, the intent of the parties to a written contract must be ascertained from the words used in the contract, without resort to extrinsic evidence. Extrinsic evidence is admissible regarding the intent of parties to a contract only if a latent ambiguity exists." *Id*. (quotations and citation omitted).

For purposes of the Sellers' latent ambiguity claim, there are a few important points. First, the Sellers do not argue that any ambiguity appears on the face of the Contract. The Contract unambiguously identifies the four price components that are to be indexed and the indexes that are to apply to each. Second, for purposes of this motion, the Court has assumed that the indexes have indeed failed to track the Sellers' actual unit costs. Third, there can be no doubt that the Contract does not address what the parties should do if the indexes fail to track the Sellers' actual unit costs.

Nevertheless, for the Court to find that the absence of such a provision creates a latent ambiguity requiring extrinsic evidence of the parties' intent in an otherwise unambiguous contract, it must first find, considering just the language of the Contract, that the parties intended for the indexes to track the Sellers' actual unit costs. The Court cannot permit extrinsic evidence of the parties' intent to *create* the latent ambiguity, but only to *resolve* it.

This is clear from *Forest Hills Utilities, Inc. v. Pasco County*, 536 So. 2nd 1117 (Fla. Dist.

Ct. App. 1988), the case heavily relied upon by the Sellers.  In that case, the utility company entered into a water supply agreement with the Pasco County Water Authority, Inc. by which the utility company agreed to buy water from the water authority. Pasco County then acquired the water authority, acquiring all of its rights and obligations under the water supply agreement.  *Id*. at 1118.  The county then sued the utility company for breach of the agreement.  *Id*.

The provision of the agreement in dispute regarded the amount that the utility company was to pay for the water and stated the following:

> The utility agrees to buy and the Authority agrees to sell the said water at a price or rate of seventy cents for each 1,000 gallons of water delivered by the Authority to the utility each month, *or at such rate or price as shall, from time to time, be fixed or approved by the Florida Public Service Commission or such other agency of government having jurisdiction in this agreement.*

*Id*. (emphasis added.)

The court noted that, "[w]hen Pasco County acquired the rights of the Water Authority under the agreement, Pasco County became both the requirements supplier and the rate setter." *Id*.  The utility company argued that the original parties to the agreement – the utility company and the water authority – contemplated that the water rates would be set by an independent rate setter, not by the water supplier.  *Id*. The utility company argued that the county's purchase of the water authority created a latent ambiguity in the agreement. *Id.*

The county, on the other hand, argued there was no ambiguity at all.  It argued that the agreement required the utility company to buy the water at a rate set by a government agency.  The county was a government agency.  Thus, the county argued, it could set the rates at which it would sell the water to the utility company.  *Id*. at 1118-19.

The court determined that the provision at issue "refers to an independent rate setter; that is,

a rate setter other than the supplier of water." *Id*. at 1119.  The court made this determination as a matter of law without relying on any extrinsic evidence.

Having made the legal determination that the contract called for an independent rate setter, the court next concluded that the agreement did not address "the situation which came about; that is,  where the independent rate setter lost jurisdiction and the water supplier became the rate setter." *Id*. The court determined that this created a latent ambiguity, i.e., whether the parties to the agreement intended for the contract to continue for the remainder of the 20-year term under such circumstances. *Id*.

The *Forest Hills* court thus first concluded as a matter of law that the parties intended for the rate setter to be independent and then concluded that, when the seller became the rate setter, it created a latent ambiguity regarding what the parties would have intended if that situation arose.  In this action, at the hearing on the Buyer's motion, the Sellers argued that the court in *Forest Hill* permitted extrinsic evidence regarding whether the parties intended that the rate setter be independent.  However, the court very clearly made this determination without extrinsic evidence. It then held that, because of this determination,  the parties should be permitted to introduce extrinsic evidence of their intent regarding what should happen when the rate setter is no longer independent.

Following the court's analysis in *Forest Hills*, in order for this Court to find that the indexes' failure to track the Sellers' actual unit costs creates a latent ambiguity as to what the parties intended to do if that situation arose, the Court would first have to find from the face of the agreement that the parties intended for the indexes to track the Sellers' actual unit costs. The latent ambiguity "must become evident when the contract is read in the context of the surrounding circumstances, not after parol evidence of the parties' intent is admitted to create an ambiguity."  *Nat'l Union Fire Ins. Co.*

11

*v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995). Extrinsic evidence regarding the parties' intent is only permitted if, applying the contract language to the "context of the claim," produces an incertain or ambiguous result. *Id.*

As stated, the Court has assumed for purposes of this motion that evidence of the surrounding circumstances would show that the indexes have, in fact, failed to track the Sellers' actual costs. Applying the language of the Contract where such a failure has occurred does not produce an ambiguous result. The Contract unambiguously provides that the contract price is to be set by the designated indexes. Looking at the Contract, the Court cannot find that the parties clearly intended for the indexes to track the Sellers' actual unit costs such that their failure to do so creates a latent ambiguity. The Sellers argue that "such an intent is manifest in the fact that the Contract itself (Art. 6.3) expresses a desire to use indexes that 'most accurately reflect' unit cost changes." (Rec. No. 17, Response at 15).

In full, the provision that the Sellers refer to, Article 6.3, states:

> The Base Price is composed of six components: (1) Labor, (2) Supplies, (3) Power, (4) Equipment, (5) Fixed Portion of Base Price and (6) Government Impositions. For the purposes of price determination, the amount of the Base Price allocated to each component and subcomponent and the index representing such component and subcomponent are set forth in Appendix D.
> Should any of the indexes specified in Appendix D be discontinued, indexes specified by the appropriate government agency as the replacement indexes, if any, shall be used. If no replacement indexes are so specified, new indexes which most accurately reflect changes in the applicable cost component or subcomponent shall be substituted by mutual agreement of the parties. If the basis of the calculation of the indexes specified herein is substantially modified, the indexes as modified may continue to be used or proper indexes may be substituted by mutual agreement of the parties. Changes in the base Year(s) reporting basis, minor changes in weighing, and minor changes in benchmarks shall not be construed as substantial modification to the indexes and the affected values shall be reestablished in accordance with the instructions issued by the appropriate government agency.

12

(Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.4)

Thus, in referencing indexes that "most accurately reflect changes in the applicable cost component or subcomponent," the Contract was addressing the situation where a designated index was actually discontinued, thus requiring that new indexes be employed.  In that situation, the Contract mandates that the first option is to use the indexes specified by the appropriate government agency as the replacement indexes.  The Contract does not state that the specified replacement indexes must track the Sellers' actual unit cost.  The parties are directed to choose indexes that "accurately reflect changes in the applicable cost component or subcomponent" only if there are no replacement indexes specified.  This provision does not establish that the parties intended for the indexes to track the Sellers' actual unit costs.

Further, after reviewing the Contract as a whole, the Court cannot find that the parties clearly intended for the indexes to track the Sellers' actual unit costs.  As stated, there can be no doubt that the Contract identifies the indexes that must apply to each of the indexed components. In Article 6.3, which is the only provision the Sellers rely on to show that the parties intended for the indexes to track actual unit costs, the parties specifically identified only two instances in which the designated government indexes should be replaced – where the indexes were discontinued or substantially modified.[3]  The parties did not provide for replacement if the indexes failed to track the Sellers' actual unit costs.

After reviewing the Contract, the Court cannot conclude as a matter of law that the parties

---

[3]  In their response brief, the Sellers briefly argue that there is a factual issue regarding whether "the failure of the indexes is functionally indistinguishable from a substantial modification of the indexes."  (Rec. No. 17, Response at 19).  The Sellers did not assert an actual claim under this provision of the Contract.  Moreover, at the hearing on the Buyer's motion, the Sellers conceded this provision of the agreement does not explicitly reach this case and that there has not been any substantial modification of the indexes.

intended that the designated government indexes track the Sellers' actual unit costs.  Accordingly, the fact that the indexes have allegedly failed to track the Sellers' actual unit costs does not create a latent ambiguity which would permit the parties to submit extrinsic evidence in an otherwise unambiguous Contract.  Applying the language of the Contract, which unambiguously details how the contract price is to be set and the indexes that are to be used to set the price, does not produce an uncertain or ambiguous result.

It may be that proof of the parties' intent would establish that the parties did indeed intend for the indexes to track the Sellers' actual unit costs for the life of the Contract.  And, as will be explained, such evidence may be relevant to the Sellers' commercial impracticability claim. However, in determining whether the indexes' failure to track actual unit costs  has created a latent ambiguity, the Court is confined to examining the Contract itself.  Because the Contract does not show that it was the clear intention of the parties that the indexes would track the Sellers' actual unit costs, the Sellers' latent ambiguity claim must be dismissed.

### C.     Whether the Court can Order that the Contract is Terminated.

In Count Two of the Complaint, the Sellers ask the Court to declare that the Buyer's exercise of the extension option is void and that the Contract is terminated.  In the Complaint, the Sellers assert that "[i]t was a basic, material assumption of the Contract that the Contract Indexes would function as anticipated and that the Extension Option would be exercisable under circumstances in which that assumption and all other material assumptions of the Contract, had been fulfilled. (Rec. No. 1, Complaint, ¶ 76).

In the Complaint, the Sellers do not set forth any legal theory which would permit the Court to terminate the Contract because the designated indexes failed to track their actual costs.  In their

14

Response to the Motion to Dismiss, the Sellers argue that the Court can declare the Contract terminated because the accuracy of the indexes was a "presupposed condition to the grant or exercise of the option." (Rec. No. 17, Response at 26). They also argue that the Court has the authority to declare the Contract terminated under the Declaratory Judgment Act, 28 U.S.C. § 2202.

While this Court may have authority to declare the Contract terminated when interpreting it under the Declaratory Judgment Act, it can do so only on the basis of some legal theory or provision of the Contract. The Sellers do not cite any contractual provision or legal theory in either Count II of the Complaint or in their Response to the Motion to Dismiss this count. Accordingly, the Court will interpret Count II, not as an actual claim, but instead as a request for a particular remedy – termination of the Contract – for the Sellers' remaining claim of commercial impracticability.

**D.     Whether the Court can Excuse the Sellers' Performance for Commercial Impracticability under Fla. Stat. § 672.615.**

The Sellers argue that the Court should declare that their performance under the Contract is excused for "commercial impracticability" under § 672.615 of Florida's version of the Uniform Commercial Code ("UCC"), which corresponds with U.C.C. § 2-615.

That statute provides, in pertinent part, as follows:

> Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance. . . Delay in delivery or nondelivery in whole or in part by a seller. . . is not a breach of her or his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made. . . .

Fla. Stat. § 672.615(1).

In support of its Motion to Dismiss, the Buyer relies on *Eastern Air Lines, Inc. v. Gulf Oil*

15

*Corp.*, 415 F.Supp. 429 (S.D. Fla. 1975).

In that case, on June 27, 1972, the parties entered into a agreement by which Gulf agreed to supply Eastern with jet fuel. *Id*. at 432. The court found that "[b]oth parties knew at the time of contract negotiations that increases in crude oil prices would be expected, were 'a way of life', and intended that those increases be borne by Eastern in a direct proportional relationship of crude oil cost per barrel to jet fuel cost per gallon." *Id*. at 432-33.

The court further determined that it was because of that intention that the parties tied the price of jet fuel under the contract to the price of West Texas Sour, which the court found was a crude oil which is bought and sold in large volume and, thus, considered a reliable indicator of the market value of crude oil. *Id.* at 433. The parties agreed that, in setting the price of jet fuel under the contract, they would use the price of West Texas Sour listed in Platts Oilgram, an oil industry publication. *Id*. at 433.

The court made a host of factual findings regarding the crude oil market during the relevant time period at least some of which were attributed to Gulf's foreign oil expert witness. *Id*. at 433. The court noted that the United States had becoming increasingly dependant on crude oil from the OPEC nations and that OPEC was formed for the avowed purpose of raising oil prices. *Id* at 433. The court further found that, as a result, "[n]ationalization of crude oil resources and shutdowns of production and distribution have become a way of life for oil companies operating in OPEC nations. . . ." *Id*. The court further noted that foreign crude oil prices were several dollars per barrel higher than domestic crude oil. *Id*.

The court found that, as a result, the U.S. government implemented two-tier price controls: one price for "old oil," or the number of barrels of oil a well produced in May 1972; and one price

for "new oil," or the number of barrels of oil produced by a well beyond its May 1972 production levels. *Id*. at 433-34.  In general, the government froze the price for old oil while new oil was free from government price controls.  *Id.* at 434.  The court noted that, after the oil embargo of 1973, the price of new oil rose dramatically.  *Id*.  Platts, however, continued to publish only the price of old oil.  *Id*.

As a result, Eastern was paying Gulf on the basis of the price of old oil.  *Id*.  Gulf demanded that Eastern pay more for jet fuel or Gulf would quit supplying it.  *Id*. at 432.  Eastern sued Gulf for breach of contract and Gulf asserted commercial impracticability, among other things, as a defense. *Id*.  The court issued its opinion and made its factual findings after conducting a trial at which both parties produced expert testimony from internationally respected experts who described "in depth" the relevant economic events. *Id*

In addressing Gulf's commercial impracticability defense, the court first noted official comments 4 and 8 to U.C.C. § 2-615 which provide the following

> 4.     Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance. Neither is a rise or a collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover. But a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section. (*See Ford & Sons, Ltd., v. Henry Leetham & Sons, Ltd.*, 21 Com.Cas. 55 (1915, K.B.D.).)

> 8.     The provisions of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting, in trade usage and the like. Thus the exemptions of this section

17

> do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms, either consciously or as a matter of reasonable, commercial interpretation from the circumstances. (*See Madeirense Do Brasil, S.A. v. Stulman-Emrick Lumber Co.*, 147 F.2d, 399 (C.C.A. 2 Cir. 1945).) . . ..

*Id*. at 438.

Synthesizing these comments, the court determined that, in order for U.C.C. § 2-615 to apply:

> [T]here must be a failure of a pre-supposed condition, which was an underlying assumption of the contract, which failure was unforeseeable, and the risk of which was not specifically allocated to the complaining party. The burden of proving each element of claimed commercial impracticability is on the party claiming excuse.

*Id*.

The court further declared that, "unforeseen cost increase that would excuse performance must be more than merely onerous or expensive. It must be positively unjust to hold the parties bound" and that, a "mere showing of unprofitability without more, will not excuse the performance of the contract." *Id*. The court went on to cite approvingly *Neal-Cooper Grain Co. v. Texas Gulf Sulfur Co.*, 508 F.2d 283, 293, 294 (7th Cir. 1974), in which the Seventh Circuit held:

> The fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused.' We will not allow a party to a contract to escape a bad bargain merely because it is burdensome'. '(T)he buyer has a right to rely on the party to the contract to supply him with goods regardless of what happens to the market price. That is the purpose for which such contracts are made.

*Id*.

Neither party has cited any cases that would alter the analysis or holding of *Gulf Oil* and the Court has not located any such case. Following the court's reasoning in *Gulf Oil*, this Court cannot find that the Sellers' performance is excused for commercial impracticability unless it finds all of

18

the following:  1)  that  the indexes have truly failed to reflect the Sellers' actual unit costs; 2) that the indexes' failure has caused the Sellers' claimed financial losses; 3) that both parties assumed the indexes would track the Sellers' actual unit costs for the life of the Contract; 4) that the failure of the indexes to track the Sellers' actual unit costs was unforeseeable;  5) that the Sellers did not assume the risk that the indexes would fail to track their actual costs; and 6) that the losses suffered by the Sellers are not just onerous but are positively unjust. If the Sellers fail to prove any one of these factors, then their claim of commercial impracticability must fail.

For purposes of this motion, the Court has assumed that the Sellers can prove that indexes have failed to reflect their actual costs and that they will suffer $49 million in damages.  The Court has also assumed that the index failure is the cause of the Sellers' $49 million loss.  The Buyer has not really tried to dispute these issues in its Motion to Dismiss. Instead, the Buyer urges the Court to find as a matter of law that the parties did not assume that the indexes would track the Sellers' actual unit costs for the life of the Contract and that the index failure was a foreseeable risk that the Sellers assumed through various provisions of the Contract.

The Buyer argues that the Contract unambiguous and expressly states the parties' intention that the identified indexes would  govern the price of the applicable indexed components.  There can be no doubt about this.  However, the Court does not believe that the parties' decision to use the indexes alone resolves as a matter of law whether they foresaw or assumed the risk that the indexes may fail to track the Sellers' actual unit costs.

It is true as the Buyer points out, that in *Gulf Oil* the court determined that the parties to the contract unambiguously intended to be bound by the oil prices published in Platt's. *Id.* at 439.  But, in finding that Gulf's performance could not be excused for commercial impracticability, the court

19

also made a whole host of factual findings after conducting a trial. *Id.* at 439 (finding, based on expert testimony, that oil companies continued to use the prices reported in Platt's in contracts between themselves and noting that there had been no showing that the Platt's postings did not reflect the actual market price of oil); *Id.* at 440 (finding that Gulf had not proved whether it actually lost money on sales of jet fuel to Eastern and that Gulf had not established any undue hardship because Gulf recorded its highest profits during the years in question); *Id.* at 441-42 (noting as to foreseeability that "[t]he record is replete with evidence as to the volatility of the Middle East situation, the arbitrary power of host governments to control the foreign oil market, and repeated interruptions and interference with the normal commercial trade in crude oil"); *Id.* at 442 (finding that the change to two-tier price controls was foreseeable, noting that "[g]overnment price regulations were confused, constantly changing, and uncertain during the period of the negotiation and execution of the contract").

The Buyer argues that the price-indexing mechanism carries inherent risks for both the Buyer and the Sellers. To make this finding, however, the Court must rely on some evidence of the historic accuracy of the price indexes at issue in this case or some other evidence from which the Court could conclude that there are foreseeable risks in the use of price indexes. There is no such evidence at this point in the proceeding. The Buyer cites *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265 (7th Cir. 1986). In that case, the Seventh Circuit upheld the trial court's refusal to submit the buyer's commercial impracticability defense to the jury. However, that determination was made after the court was able to hear evidence presented at trial.

In arguing that the Sellers assumed the risk that the indexes would not track their actual costs, the Buyer points out that the parties failed to include provisions permitting the parties to terminate

the Contract for "economic hardship" or "gross inequity."  Further, there is no provision that permits the Sellers to renegotiate or re-open the contract price.  Instead, the Contract contains a clause that permits only the Buyer a one-time adjustment – for the period commencing January 1, 2001 – in the contract price for coal.  (Rec. No. 1, Complaint, Ex. A. Contract, Art. 1.2c(1)). The Court agrees that the absence of these provisions is relevant to the assumption-of-risk determination.  However, the absence of such provisions does not resolve the issue as a matter of law.

The Buyer also argues that the Court need look no further than the Contract's force majeure clause to conclude that the Sellers' performance cannot be excused because of the alleged failure of the indexes.  That clause provides, in pertinent part, as follows:

> "Seller's Force Majeure" as used herein shall mean a cause reasonably beyond the control of Seller which wholly or in substantial part prevents the mining or delivery of coal. . . [F]orce majeure shall not include, and neither party shall be excused from performance because of the development or existence of economic conditions which may adversely affect the anticipated profitability of the mining activities of Seller hereunder or which may adversely [a]ffect the use of coal by the Buyer.

(Rec. No. 1, Complaint, Ex. A., Contract, Art. 8.1).

This clause may be relevant to the commercial impracticability determination.  However, the clause does not specifically address the failure of the price indexes to track the Sellers' actual unit costs but instead addresses "economic conditions which may adversely affect the anticipated profitability of the mining activities of Seller."  At the hearing on the Motion to Dismiss, the Sellers argued that they do not seek to be excused from performance on the basis of economic conditions but rather on the basis that the indexes failed to accurately track economic conditions.  In other words, the Sellers seem to assert that they would not be complaining if the problem were just that the cost of roof bolts had increased if that increase had been correctly reflected in the appropriate

index.  Instead, their complaint is that the cost of roof bolts is up and the designated index is not reflecting that increase. Thus, while the force majeure clause may be relevant to the commercial impracticability analysis, it does not resolve it as a matter of law.

Finally, the Buyer argues that the Sellers cannot show that the contingency – the failure of the price indexes to track the Sellers' actual costs – is more than merely onerous or expensive and is instead positively unjust because the Sellers only allege costs increases of 42 percent. The Buyer argues that courts generally hold that costs must increase more than 100% to make the seller's performance impracticable.  The Buyer does not cite any Florida case holding that, as a matter of law, a seller's costs must double before his performance is excused under Section 2-615.  Every case that the Buyer cites in support of this proposition was decided after evidence was presented to the court. S*ee Publicker Industries, Inc. v. Union Carbide Corp.*, 17 U.C.C. Rep. 989 (E.D. Pa. 1975) (referring to the "testimony" presented by various experts); *Schafer v. Sunset Packing,* 474 P.2d 529 (Or. 1970)(bench trial); *Iowa Electric Light & Power Co. v. Atlas, Corp.*, 467 F.Supp. 129 (N.D Iowa 1978) (trial), *overruled on other grounds by*, 603 F.2d 1301 (8th Cir. 1979); *Louisiana Light & Power Co. v. Allegheny Ludlum Indus., Inc.*, 517 F.Supp. 1319 (E.D. La. 1981)(motion for summary judgment).

At this point, the Court is only able to consider the Contract itself in making its determination as to whether the Sellers' performance is commercially impracticable.  Because the Court cannot resolve the issue on the Contract alone, the Buyer's Motion to Dismiss the Sellers' commercial impracticability claim must be denied.

## IV.    CONCLUSION.

For all these reasons, the Court hereby ORDERS as follows:

1)   the Buyer's Motion to Dismiss (Rec. No. 13) is GRANTED in part and DENIED in part;

2)   the Motion to Dismiss is GRANTED as to the Sellers' claim under Fla. Stat. § 672.305(1)
     and the Sellers' claim that the Contract contains a latent ambiguity and those claims are
     DISMISSED; and

3)   the Motion to Dismiss is DENIED as to the Sellers' claim that their performance under the
     Contract is commercially impracticable.

     Dated this 30th day of September, 2008.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**