Eastern District of Kentucky
FILED

SEP 1 7 2010

AT LONDON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 6:07-CV-444-KKC

TECO COAL CORPORATION and
PREMIER ELKHORN COAL COMPANY,                    PLAINTIFFS,

v.                          OPINION & ORDER

ORLANDO UTILITIES COMMISSION,                    DEFENDANT.

**** **** **** ****

This matter is before the Court on the Motions for Summary Judgment on the Amended

Complaint and for Partial Summary Judgment on the Counterclaim (Rec. No. 157) filed by the

Defendant, the Orlando Utilities Commission ("Orlando").

Orlando entered into a long-term sales contract (the "Contract") with the Plaintiffs TECO

Coal Corporation and Premiere Elkhorn Coal Company (together "TECO") by which TECO agreed

to sell coal to Orlando. TECO asserts that, from 2008 to 2011, it will lose a total of $25.1 million

because the price for coal under the Contract did not rise in accordance with the inflation in TECO's

costs as the parties intended. TECO further asserts that neither party foresaw the possibility of such

massive losses for TECO and that it should be excused from performing the Contract under the

doctrine of commercial impracticability.

I.      FACTS.

TECO is the parent company of Premier. (Rec. No. 79, Complaint, ¶ 13). Premier mines and

sells the coal sold to Orlando under the Contract (Rec. No. 79, Amended Complaint, ¶ 23). Under

the Contract, Orlando agreed to purchase 480,000 tons of coal each year from TECO, plus or minus

twenty percent (20%). (Rec. No. 1, Complaint, Ex. A, Contract, Art. 2.1). The Contract contained an expiration date of December 31, 2006 but granted Orlando the option to extend the Contract for five years, through December 31, 2011. (Rec. No. 1, Complaint, Ex. A, Contract, App. A). Orlando has exercised the option to extend the Contract through 2011. (Rec. No. 79, Amended Complaint, ¶ 6).

### A.    Adjustments in the Coal Price Based on Indexes.

The Contract establishes a base price for the coal of $24.49 per ton. (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.1, App. D). This was the contract price for the coal for the first six months of the Contract. (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.2, App. D). The base price is made up of six components: labor, supplies, power, equipment, the fixed price component, and government impositions. (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.3, App. D). The Contract mandates that the "Labor, Supplies, Power, and Equipment components of the Base Price shall be subject to individual adjustment every 6 Months to reflect changes" in certain government indexes specified in the Contract. (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.4, App. D). The government indexes specified for each of these components in the Contract are:

| | | |
|---|---|---|
| Labor | — | Average Hourly Earnings – Bituminous Coal & Lignite Mining Standard Industrial Classification ("SIC") 122 |
| Supplies | — | Producer Price Index ("PPI") – Industrial Commodities Less Fuel and Related Products and Power |
| Power | — | Industrial Power – PPI 0543 |
| Equipment | — | Mining Machinery – PPI 1192 |

(Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.3, App. D).

The Contract specifies what must occur should any of the indexes specified in the Contract

2

be "discontinued." In such an event, the "indexes specified by the appropriate government agency as the replacement indexes, if any, shall be used." (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.3). If, however, no replacement indexes are specified by the appropriate government agency, then "new indexes which most accurately reflect changes in the applicable cost component or subcomponent shall be substituted by mutual agreement of the parties." (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.3).

The Contract also specifies what shall occur if "the basis of the calculation of the indexes specified herein is substantially modified." In such an event, "the indexes as modified may continue to be used or proper indexes may be substituted by mutual agreement of the parties." (Rec. No. 1, Complaint, Ex. A, Contract, Art. 6.3).

## B.   TECO's Cost Increases.

TECO asserts that, for the first six years of the Contract, the indexes functioned as intended because they captured 92 percent of the increases in the unit cost of the goods and services used to mine coal. (Rec. No. 79, Amended Complaint, ¶ 35). TECO alleges, however, that, beginning in 2002, the designated price indexes failed to capture the bulk of the cost increases incurred by TECO. It alleges in its Complaint that, as a result, it will lose tens of millions of dollars. (Rec. No. 79, Amended Complaint, ¶ 2).

In its response to Orlando's Motion for Summary Judgment, TECO asserts that, as of August 2009, its unrecovered costs total ███ on each ton of coal sold under the Contract and that it sells approximately ███ tons of coal to Orlando each year, which amounts to an annual loss of approximately ███ due to the unrecovered costs. (DE 168 at 6-7). It asserts that its unrecovered costs for the 2008 to 2011 period will total at least ███ (DE 168 at 7). In a

3

more recent filing, TECO indicates its unrecovered costs are ████████ per ton (DE 189).

## C.    The Remedies Sought by TECO.

In its Amended Complaint, TECO asks the Court to declare its performance under the Contract for the years 2008 to 2011 commercially impracticable under Fla. Stat. § 672.615 and excuse them further performance until either their performance is no longer commercially impracticable or the Contract has expired at the end of 2011. (Rec. No. 79, Amended Complaint, ¶ 62, Prayer for Relief § (c)). Alternatively, TECO asks the Court to "adopt replacement indexes that are most likely to accurately reflect changes in the costs of the goods and services in the mining and production of coal. . . ." (Rec. No. 79, Amended Complaint, ¶ 62, Prayer for Relief § (e)).

In its Amended Complaint, TECO also asks that, if the Court should determine that the Plaintiffs' performance under the Contract has been commercially impracticable since the filing of this action, then Orlando should be required to make restitution to TECO for the difference between what the price was under the price indexes contained in the Contract and what the price would have been had the indexes functioned as intended. (Rec. No. 79, Amended Complaint, ¶ 64, Prayer for Relief § (d)).

Orlando moved to dismiss TECO's commercial impracticability claim and the Court denied that motion finding that it could not determine based on the record at that time whether TECO's performance is commercially impracticable. The parties have now conducted extensive discovery and Orlando moves for summary judgment in its favor on the claim of commercial impracticability asserted in the Amended Complaint.

## D.    Orlando's Counterclaim.

Orlando has asserted a counterclaim against TECO. (DE 98). In it, Orlando asserts that

TECO failed to deliver approximately 74,602 tons of coal to Orlando in 2008 that it was required to deliver under the Contract. Orlando asserts that, by letter dated December 5, 2008, TECO claimed that this was due to circumstances allegedly constituting force majeure under the Contract.

Orlando asks the Court to declare that TECO's assertion of force majeure is invalid under the terms of the Contract and also asserts a breach of contract against TECO for failing to deliver the required tonnage.

TECO set forth various affirmative defenses to the claim (DE 82). Among them are the assertion that the shortage is excused by the force majeure provision of the Contract; failure to state a claim; failure to mitigate damages, estoppel, waiver, and laches. With its motion for summary judgment, Orlando asks the Court to rule that each of these defenses fails as a matter of law.

Orlando also asks for a ruling as a matter of law that it may elect its remedy under either Section 9.1 of the Contract or under Fla. Stat. § 672.713. In its response, TECO does not dispute this portion of Orlando's motion. Accordingly, the Court will grant the ruling regarding election of remedies as requested.

## II.    ANALYSIS.

Under Fed. R. Civ. P. 56, summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A.    ORLANDO'S MOTION FOR SUMMARY JUDGMENT ON TECO'S COMMERCIAL IMPRACTICABILITY CLAIM.

#### 1)    Elements of the Commercial Impracticability Defense.

5

TECO argues that the Court should declare that its performance under the Contract is excused for "commercial impracticability" under § 672.615 of Florida's version of the Uniform Commercial Code ("UCC"), which corresponds with U.C.C. § 2-615.

The Florida statute provides, in pertinent part, as follows:

> Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance. . . Delay in delivery or nondelivery in whole or in part by a seller. . . is not a breach of her or his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made. . . .

Fla. Stat. § 672.615(1).

Commercial impracticablity is "rarely allowed as an excuse for nonperformance." *McGinnis v. Cayton*, 312 S.E.2d 765, 775 (W.Va. 1984)(Harshbarger, J., concurring)(citing cases); *Golsen v. ONG Western, Inc.*, 756 P.2d 1209, 1221 (Okla.1988)(Kauger, J., concurring). The case relied upon by TECO in which the seller's performance was excused for commercial impracticability is *Aluminum Company of America ("ALCOA") v. Essex*, 499 F.Supp. 53 (W.D. Pa. 1980) and that case has been "soundly criticized." *Golsen*, 756 P.2d. at 1222 (Kauger, J., concurring). One court cautioned that "under the logical consequences of [*ALCOA*], there would be no predictability or certainty for contracting parties who selected a future variable to measure their contract liability. Whichever way the variable fluctuated, the disappointed party would be free to assert frustrated expectations and seek relief via reformation." *Wabash v. Avnet, Inc.*, 516 F.Supp. 995, 999 n.5 (N.D. Ill. 1981).

Further, "[p]romisors seeking to establish impracticability by reason of increased expense have not generally found a sympathetic ear in court." *Matter of Westinghouse Elec. Corp. Uranium*

*Contracts, Litigation*, 517 F.Supp. 440, 453 (E.D. Va. 1981).

The parties have pointed to no case in which the court found the seller's performance excused for commercial impracticability under Florida law. The most thorough analysis of the Florida statute is found in *Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F.Supp. 429 (S.D. Fla. 1975), where the court rejected the commercial impracticability defense by the seller, Gulf Oil.

In that case, on June 27, 1972 – before the October 1973 Arab oil embargo – Gulf Oil entered into an agreement with Eastern, agreeing to supply Eastern with jet fuel. *Id.* at 432. One of the raw materials from which jet fuel is processed is crude oil. *Id.* The court found that "[b]oth parties knew at the time of contract negotiations that increases in crude oil prices would be expected, were 'a way of life', and intended that those increases be borne by Eastern in a direct proportional relationship of crude oil cost per barrel to jet fuel cost per gallon." *Id.* at 432-33.

The court further determined that it was because of that intention that the parties tied the price of jet fuel under the contract to the price of West Texas Sour, a crude oil which is bought and sold in large volume and, thus, considered a reliable indicator of the market value of crude oil. *Id.* at 433. The parties agreed that, in setting the price of jet fuel under the contract, they would use the price of West Texas Sour listed in Platts Oilgram, an oil industry publication. *Id.* at 433.

The court noted that the United States had becoming increasingly dependant on crude oil from the OPEC nations and that OPEC was formed for the avowed purpose of raising oil prices. *Id.* The court further found that, as a result, "[n]ationalization of crude oil resources and shutdowns of production and distribution have become a way of life for oil companies operating in OPEC nations. . . ." *Id.* Further, domestic crude oil was subject to government-imposed price controls while foreign oil was not. *Id.* Thus, foreign crude oil prices were several dollars per barrel higher than domestic

crude oil. *Id.*

The court found that, as a result, the U.S. government implemented two-tier price controls on domestic oil: one price for "old oil," or the number of barrels of oil a well produced in May 1972; and one price for "new oil," or the number of barrels of oil produced by a well beyond its May 1972 production levels. *Id.* at 433-34. The government froze the price for old oil. *Id.* For each barrel of "new oil" produced from a given well, the government "released" a barrel of old oil from that well from government price controls. *Id.* at 434. Thus, both the "new oil" and the "released oil" were free from government price controls. *Id.*

After the oil embargo of 1973 and the resulting energy crisis, the price of new and released domestic oil rose dramatically. *Id.* Platts, however, continued to publish only the price of old oil which was subject to government price controls. *Id.* As a result, Eastern was paying Gulf on the basis of the price of old oil. *Id.* Gulf demanded that Eastern pay more for jet fuel or Gulf would quit supplying it. *Id.* at 432. Eastern sued Gulf for breach of contract and Gulf asserted commercial impracticability, among other things, as a defense. *Id.*

In addressing Gulf's commercial impracticability defense, the court noted official comments 4 and 8 to U.C.C. § 2-615 which provide the following:

4.   Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance. Neither is a rise or a collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover. But a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section. (*See Ford & Sons, Ltd., v. Henry Leetham & Sons, Ltd.*, 21 Com.Cas. 55 (1915, K.B.D.).)

8

8.    The provisions of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting, in trade usage and the like. Thus the exemptions of this section do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms, either consciously or as a matter of reasonable, commercial interpretation from the circumstances. (*See Madeirense Do Brasil, S.A. v. Stulman-Emrick Lumber Co.*, 147 F.2d, 399 (C.C.A. 2 Cir. 1945).) . . ..

*Id.* at 438.

Synthesizing these comments, the court determined that, in order for U.C.C. § 2-615 to apply:

[T]here must be a failure of a pre-supposed condition, which was an underlying assumption of the contract, which failure was unforeseeable, and the risk of which was not specifically allocated to the complaining party. The burden of proving each element of claimed commercial impracticability is on the party claiming excuse.

*Id.*

Other courts looking at Section 2-615 of the Uniform Commercial Code have phrased the elements somewhat differently but, in the end, the evidence required is the same. These courts require the seller to prove that: 1) a contingency occurred; 2) the contingency made the seller's performance impracticable; and 3) the non-occurrence of the contingency was a basic assumption on which the contract was made. *See, e.g., The Waldinger Corp. v. CRS Group Engineers, Inc.*, 775 F.2d 781, 786 (7th Cir. 1985). In analyzing the last element, these courts look at whether the occurrence of the contingency was foreseeable, thus indicating that the seller assumed the risk of its occurrence in the absence of a provision to the contrary. *Id.* at 786-87.

As to the evidence required to show that performance has been made impracticable, in *Gulf*

9

*Oil*, the court agreed with British cases holding that, "the unforeseen cost increase that would excuse performance must be more than merely onerous or expensive. It must be positively unjust to hold the parties bound." *Id.* The court noted that American courts had also strictly construed the doctrine and that a "mere showing of unprofitability without more, will not excuse the performance of the contract." *Id.* The court went on to cite approvingly from *Neal-Cooper Grain v. Texas Gulf Sulphur Co.*, 508 F.2d 283 (7th Cir. 1974), in which the Seventh Circuit stated, "[t]he fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused." *Id.* at 293. "We will not allow a party to a contract to escape a bad bargain merely because it is burdensome... [T]he buyer has a right to rely on the party to the contract to supply him with goods regardless of what happens to the market price. That is the purpose for which such contracts are made." *Id.* at 294.

In *Gulf Oil*, the court determined that, even if Gulf had established economic hardship, its defense would fail because the events associated with the energy crisis were "reasonably foreseeable at the time the contract was executed." *Id.* "If a contingency is foreseeable, it and its consequences are taken outside the scope of U.C.C. § 2-615, because the party disadvantaged by fruition of the contingency might have protected himself in his contract." *Id.*

The court found extensive evidence in the record of the volatility of the crude oil market and that "Gulf was well aware of and assumed the risk that the OPEC nations would do exactly what they have done." *Id.* at 442. Likewise, the court found foreseeable the "two-tier" pricing structure under which new oil and released oil were free from government price controls, noting that government price regulations at the time of the negotiation and execution of the contract were "confused, constantly changing, and uncertain." *Id.*

10

In its ruling on Orlando's motion to dismiss, this Court determined that, following the court's reasoning in *Gulf Oil*, this Court could not find that TECO's performance is excused for commercial impracticability unless it finds all of the following: 1) that the indexes have truly failed to reflect TECO's actual unit costs; 2) that the indexes' failure has caused TECO's claimed financial losses; 3) that both parties assumed the indexes would track TECO's actual unit costs for the life of the Contract; 4) that the failure of the indexes to track TECO's actual unit costs was unforeseeable; 5) that TECO did not assume the risk that the indexes would fail to track their actual costs; and 6) that TECO's losses are not just onerous but are positively unjust. In the opinion on the Motion to Dismiss, this Court further determined that, if TECO fails to prove any one of these factors, then its claim of commercial impracticability must fail.

### 2) TECO's Commercial Impracticability Claim.

In analyzing TECO's claim of commercial impracticability, it is important to understand precisely what that claim is. TECO claims that its performance has become commercially impracticable because the indexes designated in the Contract have failed to capture inflation in its "unit costs," which it defines as the amount it "pays for a unit of something." (DE 168 at 6,9).

But TECO does not provide evidence of its individual "unit costs," of the increase in those individual costs, or of the price increases reflected in the appropriate index. Instead, TECO's expert, Rick Thomas, calculated TECO's *total* annual surface mining costs from 2002 to 2008, the years that TECO alleges the coal sales price failed to track the increase in TECO's surface mine operating costs. (DE 168, Ex. 219 at 2-3, 17-22 ).

Thomas then determined for each year the total increase in TECO's surface mine operating costs that was attributable solely to increases in the price of goods and services. (DE 168, Ex. 219

11

at 2-3, 5, 17-22). He then determined for each year the portion of these increased costs that was "not recovered by the [Contract] coal sales price escalation." (DE 168, Ex. 219 at 2-3, 5, 17-22). These are the total "unrecovered costs" incurred by TECO. Again, TECO asserts that these unrecovered costs currently total ███ per ton (DE 189).

In determining the total "unrecovered costs," Thomas includes all of the goods and services TECO utilizes in producing coal. There is no evidence, however, that the designated contract indexes were actually designed to track all these costs. For example, one of the designated indexes is "Industrial Commodities *Less Fuel and Related Products and Power*." This index explicitly does not track the costs of fuel. Thomas himself states that none of the indexes designated in the Contract would cover fuel which amounts to about ██ percent of TECO's total surface mine costs. (DE 168, Ex. 219 at 23-24). However, to demonstrate the alleged "failure" of the contract indexes, Thomas includes fuel in the calculation of TECO's total cost increases that are not recovered by the price for coal under the Contract. (DE 168, Ex. 219 at 18).

Likewise, in demonstrating the "failure" of the indexes to capture TECO's total operating costs, Thomas includes labor benefits among those costs. (DE 168, Ex. 219 at 18). These costs include medical insurance, workers compensation, other fringe benefits, and payroll taxes. (DE 168, Ex. 219 at 23). However, the labor index designated in the Contract tracks only "average hourly earnings." It is not designed to track benefits. It is clear from Thomas's report that no index specified in the Contract was intended to cover these benefits.

Thomas also includes trucking and other "miscellaneous" costs in the calculation of TECO's total operating costs that he asserts were not captured by the indexes. He asserts that trucking costs accounts for about ██ percent of TECO's surface mine costs and that "miscellaneous" cost items

12

cost TECO about ▮ per ton in 1995. (DE 163, Ex. 219 at 18, 24). Again, however, none of the contract indexes was designed to track these costs.

The contract indexes cannot be said to have "failed" on the basis that they did not track cost increases that they were not designed to track. Thomas's report makes clear that the real problem is not that the four indexes designated in the Contract have "failed" to do what they are intended to do. Instead, the problem is that the indexes designated in the Contract were not designed to track large portions of TECO's costs. In fact, of the four indexes designated in the Contract, Thomas suggests that three of them should continue to be used – labor, equipment, and supplies. These indexes cannot be said to have "failed" if TECO itself asserts that they worked well enough that they should continue to be used to set the price for coal under the Contract.

Thomas suggests that the Contract be reformed to add an index to track labor benefits and to replace the designated power index with an index that would track fuel. He also suggests that indexes be added that would track trucking, and miscellaneous cost items.

Thus, the contingency upon which TECO's commercial impracticability claim is based is not the failure of the Contract indexes to track the unit costs they were designed to track. Instead, the contingency upon which TECO's claim is based is the failure of the indexes designated in the Contract to track unit costs they were *not* designed to track.

It is also important to note that TECO's claim is not based on any events that may have caused the indexes to fail to track TECO's total costs. In fact, TECO never explains why, after working acceptably for the first six years of the Contract (1996-2001), the indexes failed to cover all of TECO's costs beginning in 2002.

In this way, this case is different than *Gulf Oil* and other cases in which the sellers asserted

13

that their performance was impracticable because of the failure of contract indexes to perform as intended. In *Gulf Oil*, Gulf claimed that the reason the contract price escalator no longer accurately captured its cost increases was because of various events associated with the 1973 energy crisis that arose after the signing of the contract at issue. 415 F.Supp. at 441. The court determined that those events were reasonably foreseeable at the time the contract was signed. *Id.*

Likewise, in *Missouri Public Service Company v. Peabody Coal Company*, 583 S.W. 2d 721 (Mo. Ct. App. 1979), another case where the contract price of coal was set to escalate in accordance with inflation as measured by a specified government index, the seller claimed the index's failure in this regard was, at least in part, due to the 1973 oil embargo. *Id.* at 723. The court again found that the possibility of the oil embargo was "common knowledge" and foreseeable. *Id.* at 728.

In this case, however, TECO does not assert that the contingency making its performance impracticable consists of any event that caused the indexes to fail to perform as they were designed to. Instead, it asserts that the contingency is simply the failure of the indexes to track all of its unit costs. This is the contingency that the Court will analyze to resolve TECO's commercial impracticability claim.

### 3) The Unforeseeability Requirement.

The next issue, then, is whether it was a "basic assumption" when the parties entered into the Contract that the indexes would not fail to track all of TECO's operating costs, even costs that the indexes designated in the Contract were not designed to track.

As discussed, in analyzing whether the non-occurrence of a contingency was a basic assumption under which a contract was made, the *Gulf Oil* court and other courts have looked to whether the contingency was "unforeseeable" and whether the seller assumed the risk that the

14

contingency would occur. If the contingency was foreseeable, then it is presumed that the seller assumed the risk that the contingency would occur in the absence of a provision to the contrary. Thus, it cannot be said that the non-occurrence of the contingency was a "basic assumption" of the parties when they entered into the Contract as required under Section 2-615.

TECO briefly argues in its response (DE 168 at 32) that what matters for the commercial impracticability analysis is not whether the failure of the indexes was *unforeseeable* by the parties but instead whether the failure was *actually unforeseen* by the parties. In support of this argument, TECO points out that neither U.C.C. § 2-615 nor Fla. Stat. § 672.615(1) explicitly requires that an event be *unforeseeable* in order for it to render the seller's performance commercially impracticable. Instead, the statute requires that the nonoccurrence of the contingency be "a basic assumption on which the contract was made."

Likewise, TECO points out, the Official Comment to Section 2-615 provides that a seller is excused from performance where his performance has become commercially impracticable "because of *unforeseen* supervening circumstances not within the contemplation of the parties at the time of contracting." U.C.C. § 2-615, Official Comment, ¶ 1 (emphasis added). TECO argues this language in the statute and the Official Comment indicate that what matters for a commercial impracticability defense is whether the contingency was *actually foreseen* by the parties.

It is true that portions of the Official Comment discuss "unforeseen" contingencies as opposed to "unforeseeable" contingencies. U.C.C. § 2-615, Official Comment, ¶¶ 1, 4 (emphasis added). However, the Official Comment also states that Section 2-615 does not apply "when the contingency in question is *sufficiently foreshadowed* at the time of contracting" so as to be considered a business risk which is "fairly to be regarded as part of the dickered terms, *either consciously or as a matter of*

15

*reasonable, commercial interpretation from the circumstances.*" U.C.C. § 2-615, Official Comment, ¶ 8 (emphasis added).

The Comment recognizes that a seller can assume the risk that the particular contingency will occur, in which case his performance would not be excused by this section when that contingency does, in fact, arise. And in determining whether a seller can be said to have assumed the risk of a particular contingency, the "circumstances surrounding the contracting" and "trade usage and the like" are to be considered. U.C.C. § 2-615, Official Comment, ¶ 8 .

In looking at these circumstances surrounding the contracting to determine whether a seller assumed the risk of the contingency at issue, most courts have determined that the seller is presumed to have assumed the risk of any contingency that is foreseeable at the time of contracting.

"Because the purpose of a contract is to place the reasonable risk of performance upon the promisor . . . it is presumed to have agreed to bear any loss occasioned by an event that was *foreseeable* at the time of contracting." *Waldinger Corp. v. CRS Group Engineers Inc.*, 775 F.2d 781, 786 (7th Cir. 1985)(emphasis added). In fact, in *Waldinger*, the court determined that "[t]he applicability of the defense of commercial impracticability, then, turns largely on foreseeability." *Id.*

> If the risk of the occurrence of the contingency was unforeseeable, the seller cannot be said to have assumed that risk. If the risk of the occurrence of the contingency was foreseeable, that risk is tacitly assigned to the seller. The seller's failure to provide a contractual excuse against the occurrence of a foreseeable contingency may be deemed to be an assumption of an unconditional obligation to perform. *Id.* at 1191. Phrased somewhat differently, if a contingency is foreseeable, the section 2-615 defense is unavailable because the party disadvantaged by the fruition of the contingency might have contractually protected itself.

*Id.* (citations omitted).

In *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.* , 532 F.2d 957 (5th Cir. 1976), the

16

court explained why foreseeability was critical to determining whether the seller assumed the risk of the contingency as follows:

> The rationale for the doctrine of impracticability is that the circumstance causing the breach has made performance so vitally different from what was anticipated that the contract cannot reasonably be thought to govern. However, because the purpose of a contract is to place the reasonable risk of performance on the promisor, he is presumed, in the absence of evidence to the contrary, to have agreed to bear any loss occasioned by an event which was foreseeable at the time of contracting. . . Underlying this presumption is the view that a promisor can protect himself against foreseeable events by means of an express provision in the agreement.

*Id.* at 991-92 (citations omitted). *See also Alimenta (U.S.A.), Inc. v. Cargill, Inc.*, 861 F.2d 650, 653 (11th Cir. 1988)(applying Georgia law); *Sabine v. ONG Wester, Inc.*, 725 F.Supp. 1157, 1174 (W.D. Okla. 1989); *Rockland Industries, Inc. v. E+E (US) Inc.*, 991 F.Supp. 468, 472 (D. Md. 1998).

In *Alamance County Board of Education v. Bobby Murray Chevrolet, Inc.*, 465 S.E.2d 306 (N.C. Ct. App. 1996), the court specifically determined that "[f]oreseeability under § 2-615 is an objective standard; it matters not whether the seller thought a certain event would not occur, but what contingencies were reasonably foreseeable at the time the contract was made." *Id.* at 311.

As to courts looking at Florida law, in *Gulf Oil*, as discussed, the court specifically looked at Sections 4 and 8 of the official comment and determined that, in order for U.C.C. § 2-615 to apply, the contingency must have been unforeseeable. 415 F.Supp. at 438. "If a contingency is foreseeable, it and its consequences are taken outside the scope of U.C.C. s 2-615, because the party disadvantaged by fruition of the contingency might have protected himself in his contract." *Id.* at 441 (citing *Ellwood v. Nutex Oil Co.*, 148 S.W.2d 862 (Tex.Civ.App.1941)).

In *Matter of Westinghouse Elec. Corp. Uranium Contracts Litigation*, 517 F.Supp. 440, 454 (E.D. Va. 1981), in analyzing Fla. Stat. § 672.615, the court also recognized the importance of the

foreseeability element in a commercial impracticability claim, stating:

> Success of a commercial impracticablity defense often turns on whether the promisor foresaw, or *should have foreseen*, the contingency claimed to have made performance impracticable. Where the promisor had no reason to anticipate a supervening event which radically increases the difficulty of performance, or which renders performance impossible, it is manifestly unfair to hold him to the agreement . . . Conversely, where the contingency may reasonably be said to have been foreseeable, courts have generally taken the view that the promisor should not be released from his obligation. This rule is based on the notion that where the parties can reasonably anticipate events that may affect performance, the prudent course is to provide for such eventualities in their contract.

*Id.* at 454 (emphasis added).

In accordance with these cases, the Court finds it likely that Florida's highest court would hold that a seller is presumed to have assumed the risk of any contingency that was foreseeable at the time of contracting in the absence of a provision to the contrary. Thus, TECO is presumed to have assumed the risk that the indexes would fail to capture the increase in all of its unit costs if it was foreseeable at the time the parties contracted that such a failure would occur and if there is no provision in the Contract to the contrary. The burden is on TECO, as the party claiming commercial impracticability, to prove that the failure of the indexes in this regard was not foreseeable. *Gulf Oil*, 415 F.Supp. at 438.

### 4) TECO's Evidence that the Failure of the Indexes was Unforeseeable.

Again, TECO's complaint is that the contract indexes failed to track inflation in *all* of TECO's costs. In order for its commercial impracticablity claim to have any chance of success, TECO must submit evidence that the failure of the indexes to capture all of TECO's cost increases was unforeseeable. For example, TECO could submit evidence that the costs that were covered by the designated contract indexes was unforeseeable or that the costs that it would incur in producing the

18

coal was unforeseeable. TECO submits no such evidence

In support of its claim, TECO relies on *ALCOA*. Despite the criticism that case has received, an analysis of it is helpful in understanding the shortfalls of TECO's claim. In *ALCOA*, under the agreement at issue ALCOA agreed to sell aluminum to the buyer. The contract provided that a portion of the price of aluminum under the contract would vary from its initial base in accordance with the changes in ALCOA's nonlabor costs of production as reflected in the Wholesale Price Index - Industrial Commodities ("the "WPI"). 499 F.Supp. 53, 57-58 (1980).

In that case, ALCOA presented evidence establishing that it was foreseeable that the WPI and ALCOA's costs would deviate only .03 per pound. *Id.* at 57-58, 70. This was based on a study conducted by ALCOA before the parties entered into the contract. *Id.* at 57-58. ALCOA also presented evidence that, approximately six years after the signing of the contract, electric power rates rose much more rapidly than the WPI due to OPEC's actions to increase oil prices and unanticipated pollution control costs. *Id.* at 58. To illustrate the difference between the WPI and ALCOA's actual costs, the opinion sets forth the cost increase indicated by the WPI for each year of the contract and the cost increase actually experienced by ALCOA each year. *Id.* at 57, Table 1.

TECO's claim is very different. It does not set forth the historical performance of any of the contract indexes. In his report, Orlando's expert Seth Schwartz states that index-based pricing in the coal industry had been historically inaccurate. Schwartz is the president of Energy Ventures Analysis, Inc. ("EVA") which is an energy consulting firm. Schwartz advised Orlando during the negotiation of the agreement at issue in this case. (DE 163, Ex. 274).

Schwartz states that, with an indexed-price contract such as that at issue in this case, both parties are at risk that the selected indexes will not track actual cost inflation and that the initial

19

allocation of the price into price categories will not remain accurate throughout the agreement. (DE 163, Ex. 274 at 6). Schwartz further states that the extent to which the coal price under an indexed-price contract tracks a seller's unit cost depends on 1) the number of price categories; and 2) the allocation of the base price to those categories. (DE 163, Ex. 274 at 19).

With respect to the number of price categories, Schwartz states that coal mines have many different unit costs such as fuel, power, equipment, wages, etc. He states that contracts could tie the price to dozens of cost categories but that most parties choose considerably fewer categories. (DE 163, Ex. 274 at 19). Schwartz explains that, in this case, by choosing four cost categories subject to escalation, the parties knew that the chosen indexes would not be reflecting all of the costs described by the price category. (DE 163, Ex. 274 at 19).

For example, as already discussed, Schwartz states that the labor category in the Contract was escalated only by changes to the government index which represents hourly wages for bituminous and ignite miners, but not all labor-related costs. He further states that, "[i]t had been well-established in the coal industry that there are many other unit labor costs not described by wage rates alone and that escalation by just the change in wage rates would not attempt to track these other costs." (DE 163, Ex. 274 at 20). Schwartz also states that "[t]he coal industry was well aware that medical costs were a significant component of labor costs and that changes in medical costs would not be tracked by the change in wage rates. (DE 163, Ex. 274 at 20).

Schwartz states that, by the mid-1990s, "it was well known that a base price plus escalation contract may not track actual costs." (DE 163, Ex. 274 at 22). Schwartz quotes a 1980 paper on long-term contracts written by TECO's counsel in this action stating that much could go wrong with indexed pricing including "an index might not track unit costs"; "the weighting of components within

the index could change"; "[t]he producer himself might change the (materials and supplies) mix used in his operation"; and, "there could be a serious, even disastrous, miscalculation of the base cost." (DE 163, Ex. 274 at 22 quoting Edmund M. Carney and Richard W. Metz, Risk Allocation in the Long-Term Coal Sales Agreement, Eastern Mineral Law Foundation, Proceedings of the First Annual Institute (1980)).

Schwartz states that, by the time that the parties entered into the Contract, U.S. utilities were large-scale coal consumers and had over two decades of experience with coal contracts. (DE 163, Ex. 274 at 22). Schwartz states that during the 1980s and 1990s, "a large discrepancy had developed between contract prices and market coal prices. The discrepancy was due to the fact that large improvements in coal mine productivity had allowed coal prices to remain relatively flat on a nominal dollar basis while contract prices escalated per changes in indexes." (DE 163, Ex. 274 at 23).

Schwartz states that, at that time, the coal *buyers* – not the sellers as is the case in this action – initiated actions claiming that the contract price escalation provisions were intended to track the changes in the sellers' production costs but had failed to do so and the failure should be corrected by the court or arbitrator. (DE 163, Ex. 274 at 23). Schwartz explains, "the buyers were making these claims because the contract price had escalated well above the seller's actual costs and the market prices, because the sellers and the industry in general had improved productivity and reduced costs." . . ." (DE 163, Ex. 274 at 23).

Schwartz states "[t]his extended period of contract disputes made clear that it was foreseeable that the price escalation under long-term contracts could diverge significantly from either production costs, market prices, or both." (DE 163, Ex. 274 at 23). Schwartz states that, at the time the Contract was signed, "it was clearly foreseeable to all participants in the coal industry that price escalation

under long-term coal contracts may not track production costs. There had been a long track record of litigation, renegotiation, buyouts, and industry seminars" on the subject. (DE 163, Ex. 274 at 25).

TECO does not produce any evidence that disputes Schwartz's assertion that indexed pricing had been historically inaccurate in the coal industry prior to the execution of the Contract, albeit to the benefit of the seller.   In fact, in his deposition, TECO expert Thomas agrees that, during the 10 to 15 years prior to the signing of the Contract, contract indexes actually inflated coal prices higher than the sellers' actual costs. (DE 168, Thomas Dep., Sept. 11, 2009 at 41). Thomas also recognized that, if the indexes operated to the benefit of the seller in the past by inflating the coal price beyond the seller's actual cost, then they could also inaccurately set the coal price below the seller's actual costs. (DE 168, Thomas Dep., Sept. 11, 2009 at 42).

Nor has TECO presented any evidence that disputes Schwartz's assertion that it was foreseeable that the chosen indexes would not reflect all of the costs described by the price category. TECO has presented no reason that it was unforeseeable to the parties at the time they entered into the Contract that the indexes would not track all of TECO's costs.

Nor has TECO pointed to any provision of the Contract that would indicate that TECO did not assume the risk that the indexes would fail to track inflation in all of its costs.  Accordingly, its performance cannot be excused for commercial impracticability and Orlando's Motion for Summary Judgment on this issue will be granted.

**B.    ORLANDO'S MOTION FOR SUMMARY JUDGMENT ON TECO'S DEFENSES TO ORLANDO'S COUNTERCLAIM.**

Again, Orlando has asserted a Counterclaim against TECO asserting that TECO failed to deliver about 74,000 tons of coal to Orlando in 2008. (DE 98). By letter to Orlando dated December

5, 2008, TECO claimed that this was due to circumstances allegedly constituting force majeure under the Contract.

Orlando asks the Court to declare that TECO's assertion of force majeure is invalid under the terms of the Contract and also asserts a breach of contract claim against TECO for failing to deliver the required tonnage for 2008. TECO set forth various affirmative defenses to the claim. Among them are the assertion that the shortage is excused by the force majeure provision of the Contract; failure to state a claim; failure to mitigate damages; estoppel; waiver; and laches. With its motion for summary judgment, Orlando asks the Court to rule that each of these defenses fails as a matter of law.

### 1)     Force Majeure.

Orlando submits a letter dated December 5, 2008 (DE 163, Ex. 94), in which TECO gives notice of a "Partial Force Majeure" entitling it to suspend delivery of the coal. The letter states that the force majeure consists of "production issues relating to labor shortages, permitting delays and MSHA regulatory action."

More specifically, the letter asserts that two of its mines lost production in 2008 when "contract mining companies abandoned operations." The letter asserts that three other deep mines lost production because the contract mining company for all three mines was experiencing "labor shortages" and that the problem continued. Finally, the letter asserts that a sixth mine was unable to operate in 2008 because of "unexpected and unresolved delays in obtaining the necessary Corps of Engineers Section 404 permit" and that the permit had yet to be obtained.

Orlando asks for a declaration that TECO's assertion of the force majeure provision is invalid and also asserts a breach of contract claim against TECO.

The Contract's force majeure provision states, in relevant part, the following:

"Seller's Force Majeure" as used herein shall mean *a cause reasonably beyond the control of Seller* which wholly or in substantial part prevents the mining or delivery of coal . . . Examples (without limitation) of force majeure for either party are the following: acts of God; acts of the public enemy; insurrections; riots; fires; explosions; floods; electric power failures; breakdowns of or damage to generating plants, mining equipment or preparation plant; interruptions to or contingencies of transportation; *strikes, labor disputes, and work stoppages*; embargoes; and orders or acts of civil authority (including, without limitation, a city or county ordinance or order by a regulatory agency, an act of a state legislature, an act of the United States Congress) or military authority; provided, however, for the purposes of this agreement, force majeure shall not include, and neither party shall be excused from performance because of the development or existence of *economic conditions* which may adversely affect the anticipated profitability of the mining activities of Seller hereunder or which may adversely effect the use of coal by Buyer. Scheduled outages shall not be considered force majeure. Acts or omissions of either party which constitute mismanagement shall not be considered force majeure hereunder. A deterioration of mining conditions or the development of mining conditions worse than anticipated shall not be considered force majeure hereunder.

(Rec. No. 1, Complaint, Ex. A, Contract, Art. 8.1)(emphasis added).

A trial court may interpret a contract as a matter of law when it is unambiguous "or when any ambiguity may be resolved by undisputed parol evidence of the parties' intent." *Decoplage Condominium Ass'n, Inc. v. Deco Properties & Investments, Inc.*, 971 So. 2d 860, 861 (Fla. Dist. Ct. App. 2007). In interpreting a contract, "[w]ords and phrases are given their common and ordinary meanings absent specific contractual definitions." *Murley v. Wiedamann*, 25 So.3d 27, 29-30 (Fla. App. 2009). But, if the language is ambiguous and the parties present different interpretations, then the proper interpretation is a question of fact and precludes summary judgment. *Langford v. Paravant, Inc.*, 912 So. 2d 359, 360-61 (Fla. Dist. Ct. App. 2005). A contract term that is "susceptible to different interpretations is ambiguous." *Decoplage*, 971 So. 2d at 861. Where the contract language is ambiguous, "the meaning of the agreement is for jury resolution." *Cheek v.*

*McGowan Elec. Supply Co.*, 483 So.2d 1373, 1381 (Fla. App. 1985).

The Contract unambiguously provides that *labor disputes* and *work stoppages* constitute force majeure. 

TECO does not dispute this. The first issue then is whether, when ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ this constitutes a "labor dispute" or a "work stoppage."

Neither of these terms is defined in the Contract. The Merriam-Webster dictionary defines the phrase "work stoppage'" as "a concerted cessation of work by a group of employees usually more spontaneous and less serious than a strike." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com. The parties have pointed to no language of the Contract or industry custom indicating that the phrase should not be given this ordinary meaning. Accordingly, for the purposes of this motion, the Court assumes this definition is applicable. At this point, the parties have not pointed to sufficient information in the record for the Court to determine whether the abandonment of the mines by the contract miners constitutes a "work stoppage" under this definition.

Orlando asks the Court to consider extrinsic evidence on the meaning of "work stoppage" and "labor disputes." The extrinsic evidence consists of a letter written by TECO during the contract negotiations which, according to Orlando, indicates that TECO intended the phrases "work stoppage" and "labor disputes" to include only "widespread, intense strikes." Even if the Court were to consider the letter, however, the phrases "work stoppage" and "labor disputes" could not be construed as constituting only strikes. If so, the term "strike" contained in the force majeure clause would be superfluous. The provisions of a contract must be construed, if it can be reasonably done, to give

effect to each. *University of Miami v. Frank*, 920 So.2d 81, 87 (Fla. App. 2006). Thus, the Court cannot construe the phrases work stoppage, labor disputes, and strikes to all mean "strikes."

Furthermore, pursuant to the definition of work stoppage recited above, a work stoppage is not the same as a strike. In addition, if the Court were to consider extrinsic evidence regarding the meaning of the terms "labor dispute" and "work stoppage," it would also have to consider, as TECO points out, that the mines at issue were not union mines.

Orlando asserts that the abandonment of the mines by contract workers cannot be construed as a force majeure because TECO could have avoided it by paying the contract miners more. Thus, it was not a "cause reasonably beyond" TECO's control as required under the Contract to constitute a "force majeure." Even if true, however, whether the abandonment of the mine was "reasonably beyond" TECO's control involves multiple factual issues that cannot be resolved on Orlando's Motion for Summary Judgment, i.e., how much TECO was willing to pay, how much other mines were paying, and how much TECO could reasonably pay.

Further, the force majeure provision explicitly states that, "neither party shall be required to settle any strike, work stoppage or labor dispute otherwise than on terms that are satisfactory to such party in its sole discretion." This indicates that it was within TECO's discretion to decide how to end any work stoppage at the mine. In other words, this language suggests that the work stoppage remains a force majeure while it continues even if TECO could have resolved it by paying the miners more.

Orlando also asserts that the abandonment of the TECO mines ███████████████ ███████████ "economic condition" which may adversely affect TECO's ███████████ and, thus, is not a force majeure under the Contract. The Contract, however, explicitly defines force majeure to include "work stoppages." Thus, if the facts regarding the abandonment of the mines

26

constitutes a "work stoppage", it is a force majeure under the Contract. Accordingly, the Court could not also find that the work stoppage constitutes an "economic condition" which is explicitly not a force majeure. *See Lloyds Underwriters v. Netterstrom*, 17 So.3d 732, 735 (Fla. Dist. Ct. App. 2009)(contractual clauses must be interpreted in a manner that would reconcile any conflicts).

For all these reasons, the Court cannot find as a matter of law that the cessation of work at two of TECO's mines by contract miners did not constitute force majeure under the Contract.

TECO asserts that three other deep mines ████████████████████████████ ████████████████████████████████ and that this constitutes a force majeure excusing TECO's performance. Under the Contract, labor shortages of a contract mining company would constitute a force majeure if they caused TECO's failure to perform its obligations under the Contract and were reasonably beyond TECO's control. Resolution of these issues turns on multiple factual determinations that the parties have not addressed and cannot be resolved based on the record at this point.

Finally, TECO asserts that one mine was unable to operate in 2008 because of "unexpected and unresolved delays in obtaining the necessary Corps of Engineers Section 404 permit" and that this constitutes a force majeure. Orlando's expert Seth Schwartz acknowledges in his report that this "may have been beyond TECO's control" and is "arguably a force majeure." (DE 163, Ex. 276 at 5). Resolution of this issue cannot be resolved based on the record at this point.

2) **Other Affirmative Defenses Asserted by TECO.**

Orlando also asks the Court to rule that certain other affirmative defenses asserted by TECO to Orlando's Counterclaim fail as a matter of law. These defenses are failure to state a claim, failure to mitigate damages, estoppel, waiver, and laches.

TECO does not dispute Orlando's argument that its affirmative defense of failure to state a claim fails. Further, Orlando has stated a claim that TECO has failed to perform its obligation under the Contract. Accordingly, the affirmative defense of failure to state a claim fails as a matter of law.

As to the remaining affirmative defenses – failure to mitigate damages, estoppel, waiver, and laches– these defenses are fact intensive and have not been briefed sufficiently for the Court to resolve them on summary judgment.

## IV. CONCLUSION.

For all these reasons, the Court hereby ORDERS as follows:

A) Orlando's Motion for Summary Judgment (DE 157) is GRANTED in part and DENIED in part as follows:

    1) The motion is GRANTED as to the following:

        a) TECO's claim that its performance should be excused for commercial impracticability and that claim is DISMISSED;

        b) TECO's affirmative defense of failure to state a claim which it asserts in response to Orlando's Counterclaim. This defense fails as a matter of law; and

        c) Orlando's request for a ruling that it may elects its remedy under either Section 9.1 of the Contract or under Fla. Stat. § 672.713 and the Court hereby DECLARES that Orlando may elect its remedy under either Section 9.1 of the Contract or under Fla. Stat. § 672.713; and

    2) The motion is otherwise DENIED;

B) TECO's Motion to Strike Defendant's Tender of Additional Testimony in Support of its Motion for Summary Judgment (DE 182) is DENIED as moot, TECO having withdrawn the

motion (DE 186);

C) TECO's Motion to Supplement the Record with Third Supplement to Weir International Expert Witness Report (DE 189) is GRANTED, Orlando having stated that it does not specifically object to the motion (DE 190);

D) Orlando's Motion to Bar Declaration of J.J. Shackleford concerning "Unrecovered Costs" Associated with Underground Mining (DE 175) is DENIED as moot, the Court not having relied on the declaration in ruling on the Motion for Summary Judgment; and

E) This Opinion and Order SHALL BE FILED UNDER SEAL, the memoranda having been filed under seal by the parties.

Dated this 17th day of September, 2010.

**Signed By:**
***Karen K. Caldwell*** *KKC*
**United States District Judge**